Edward Lewis SHORT, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 15954.

United States Court of Appeals
Ninth Circuit.

Oct. 2, 1959.

Rehearing Denied Nov. 13, 1959.

74

Kay & Buckalew, Wendell P. Kay, Anchorage, Alaska, for appellant.

Roger G. Connor, U. S. Atty., Jerome A. Moore, Asst. U. S. Atty., Juneau, Alaska, for appellee.

Before HAMLEY, HAMLIN and JERTBERG, Circuit Judges.

JERTBERG, Circuit Judge.

■  Appellant, after trial by jury in the district court for the Territory (now State) of Alaska, at Ketchikan, was convicted on the charge of bribery and sentenced to five years imprisonment, four and a half years of which were suspended with the provision that the suspended period be spent on probation. Final judgment having been rendered December 12, 1957, before Alaska became a State by virtue of the President's Proclamation No. 3269, of January 3, 1959, 48 U.S.C.A. note preceding section 21, this Court has appellate jurisdiction under 28 U.S.C. §§ 1291, 1294. See Parker v. McCarrey, 9 Cir., 1959, 268 F.2d 907.

The bribery, a violation of the territorial law, § 65–7–4, A.C.L.A.1949, arose in the course of a police investigation into an attempt to open the city of Ketchikan to certain unlawful activities, such as gambling and prostitution. Edward Bolton, who had lived in Ketchikan for about six years and was a bartender at a local hotel, discussed several times the possibility of "opening up" the city with Walter O. Smith, a patrolman of the Ketchikan Police Department. Smith testified that Bolton finally told him that he had arranged to have a girl come to Ketchikan and Bolton requested Smith to contact the chief of police to see if an arrangement could be made to work the girl without police interference; that Smith reported the incident to the chief of police, who in turn informed the assistant United States attorney; that Smith was ordered to continue to investigate the case and in doing so he continued to meet with Bolton; that Bolton then indicated to him that the appellant, who was the co-owner of the Pioneer Bar and Liquor Store in Ketchikan, wanted

to talk with him about opening up a gambling game in the back of his bar; that after Bolton repeated the request several times to see the appellant, the assistant United States attorney instructed Smith to do so; that after making sure that appellant would be in the bar Smith entered in plain clothes, sat down at the far end of the bar from the door, where he engaged on and off in a general conversation with appellant for about 45 minutes, and as he got up to leave appellant said, "Don't run off, Smitty, I want to talk to you a minute"; that with this he sat down again and appellant said, "I understand that the town is going to open up" and that he would like to open up a "two and four" game in back, and wanted to know how much it would cost; that Smith told appellant he didn't know, but asked what appellant thought was fair, and appellant replied that they usually paid ten or fifteen per cent, and Smith told appellant he would have to talk it over with the chief, which he did; that it was decided a counter-offer should be made immediately, and it was written out on a scratch pad, "$100 a week or 10 per cent, whichever is most—*now*."; that with the note Smith returned to the appellant's bar and told him what the chief wanted and handed him the note; that after checking with his partner appellant told Smith it was "O.K."; that after a drink Smith told the appellant's partner he was going out into the restroom where appellant joined him and handed him five $20 bills; that Smith reported the payoff to the assistant United States attorney and to the chief of police. The bills were introduced in evidence during the trial.

The chief of police testified that before his patrolman Smith returned to the appellant's bar with the counter-offer written on the note, he told Smith that because the other bribery cases, including the one involving appellant's contact Bolton, were about to be broken, with arrests to be made that night, Smith would have to get a payment of some kind from appellant before appellant was tipped off by the arrest of the others.

Appellant's testimony about the happenings in his bar was to the effect that while he did have conversations there with Smith concerning gambling, his partner had joined the conversations and that they had rejected the offer that Smith brought back from the chief of police. This testimony of the appellant was corroborated by his partner, although a government witness, a territorial policeman, testified he was in the bar when the patrolman Smith first talked with the appellant and that he did not observe that appellant's partner was then in the bar.

Appellant's only other witnesses were a vice-president of a local bank and two local businessmen who testified that appellant's reputation in the community for integrity and honesty was good—testimony which was not contradicted.

In this appeal, appellant makes four contentions:

1. That contrary to Alaska territorial law, the names of the witnesses examined before the grand jury were not inserted at the foot of the indictment or endorsed thereon;

2. That without being informed of his privilege against self-incrimination he was required to appear before a grand jury and give testimony concerning the case for which he was already under indictment, thereby impairing his constitutional rights;

3. That the allowance of government police reports into evidence after their use for impeachment purposes, the deletion of portions of the report to prevent examination by defense counsel and certain limitations placed on defense witnesses' testimony and the scope of cross-examination of government witnesses constituted error; and

4. That without any basis in the evidence, the court instructed the jury to treat with caution and weigh with great care all evidence relating to any admissions or incriminating statements claimed to have been made by the defendant outside of court.

■ Appellant's first contention concerning the government's failure to insert at the foot of the indictment or by endorsement the names of the witnesses examined before the grand jury while considering appellant's indictment raises a question which this Court has already considered. In Soper v. United States, 9 Cir., 1955, 220 F.2d 158, only two of the many witnesses appearing before the grand jury were endorsed on the indictment. Soper waived his objection, however, by failing to make a timely motion to dismiss the indictment before the trial commenced. Even so, the Court by footnote indicated the provisions of Alaska territorial law requiring the indictment to include the witnesses' names became inoperative upon adoption of the Federal Rules of Criminal Procedure, id., Note 2, page 159. Appellant strongly urges that the conclusion is erroneous, claiming that the Federal Rules of Criminal Procedure were not intended to repeal existing territorial legislation which was not inconsistent. However, we need not reach this question. Appellant has failed to show that this claimed error has been in any way prejudicial to him. As such, if there is error, it could be no more than harmless error to be disregarded under Rule 52(a) of the Federal Rules of Criminal Procedure, 18 U.S.C. This rule, and its predecessor, 18 U.S.C. § 556, has been consistently construed to prevent errors in matters of form from invalidating an otherwise valid indictment so long as the error is not prejudicial, and the indictment charges the offense in such a way as to fully inform the defendant of the violation of law, and in case of a conviction or acquittal to prevent the same defendant from being retried for the same offense. Hagner v. United States, 1932, 285 U.S. 427, 431–433, 52 S.Ct. 417, 76 L.Ed. 861; Hopper v. United States, 9 Cir., 1944, 142 F.2d 181, 184–185; Fisher v. United States, 9 Cir., 1956, 231 F.2d 99, 102. Without some showing of prejudice, we hold that appellant's objection is only to a matter of form.

■ The appellant's second contention that his constitutional rights were violated by testifying before the grand jury without being advised of his constitutional rights can be disposed of in the same manner. Again, there is no showing there was any prejudicial effect even if appellant's rights had been violated. None of the testimony given before the grand jury was used in appellant's trial, nor is there any indication that the testimony led to other evidence that was used against him. Appellant was not under subpoena to appear before the grand jury, but had only been "invited" to do so. There was testimony that he said he had consulted with his legal counsel before his appearance, and there was testimony by the grand jurors that after appellant had testified concerning the events surrounding the bribery and had voluntarily shown a photograph of the note setting forth the police "counteroffer" to the members of the grand jury, he refused to give any further information concerning his charge in the presence of the United States attorney. In the absence of the United States attorney, appellant gave only general information without revealing anything further about the charge against him. This would seem to indicate that he knew his rights against self-incrimination. Appellant's counsel states he is unable to find any authority which holds that failure to inform a defendant of his rights against self-incrimination before testifying in a grand jury investigation invalidates a preexisting indictment. Possibly this is so because of the completely phantomlike character of appellant's contention since appellant's testimony before the grand jury was never offered or received in evidence, and since appellant has failed utterly to show that he has in any manner suffered any prejudice.

We come now to the errors claimed to have been committed by the trial court in the admission and exclusion of evidence. During the cross-examination of patrolman Smith, counsel for appellant, as sanctioned by 18 U.S.C.A. § 3500, demanded copies of the police reports made by Smith. In accordance with subsection (c) of this section, the government de-

livered the reports to the court for inspection en camera. The court deleted those portions which in its opinion did not relate to the subject matter of the testimony of the witness. The deletions were made by photostating the reports with the deleted portions covered. The entire text of each report has been preserved and appellant requests that this Court determine "the correctness of the ruling of the trial judge" in making the deletions. In accordance with this request, and pursuant to the provisions of said sub-section, we have read all the deleted portions of the reports and find no error in the trial court's excisions.

On cross-examination of patrolman Smith appellant's counsel used and read into the record extracts from some of these daily reports. Some of these extracts were used to question Smith about the practice of searching a policeman before he was to receive a payoff; whether he used a pocket recording machine in the course of conversations during the investigation; the circumstances surrounding and the terms of the alleged payoff by appellant; the witness' conversation with Bolton relating to the amount Bolton was to pay to allow the prostitute Fay Hodge to operate; whether the initial payoff by Bolton was to be $100, $200 or $300; the threats and warnings to Bolton by the witness in order to secure the payoff from Bolton; and questions concerning a loan which Bolton stated had been made to him by the appellant. The extracts of the reports regarding the transactions between the witness and Bolton did not include any references to the appellant except so far as they revealed that Bolton told him the witness had borrowed money from appellant. The alleged loan, however, was in no way tied in with Bolton's illegal activities.

Apparently counsel for the government concluded that since the extracts of conversations with Bolton did not refer to the appellant, except in respect to the loan above mentioned, that the purpose of the cross-examination was to show inconsistencies between the witness' testimony on direct examination and the extracts used on cross-examination, and thereby cast suspicion on the credibility of the witness. Therefore, on redirect examination counsel for the government started to read to the jury all of the witness' daily reports made during the period of the investigation and leading up to the appellant's arrest. Without objection by appellant's counsel, counsel for the government read into the record complete reports of the activities of the witness covering a period of several days. These reports related to the unlawful activities of persons who do not figure in any way in the charges against appellant. These reports relate to Bolton, and a person named "Booger Red" who planned to bring two women to Ketchikan for the purpose of prostitution; that one of the women, Fay Hodge, had arrived; that the witness had negotiated with Bolton and Fay Hodge concerning the amount of payoff to permit her to operate; that they considered bringing Fay's sister to Ketchikan from Seattle, and that Fay Hodge had returned to Seattle to get her sister and possibly "make some kind of dope deal here in town"; that a cab driver was in the deal by transporting customers to the prostitutes; and that illicit liquor transactions would be carried on. The reports read cover approximately ten pages in the transcript. During the reading of such reports appellant's counsel made only one objection, and that objection was based on the leading nature of a question by government counsel. Finally appellant's counsel inquired of the United States attorney if he intended to read all of these reports all the way through. Government counsel indicated that he had a right to do so. At this point, however, counsel for the appellant then for the first time objected to the reading of the entire reports on the ground that 18 U.S. C.A. § 3500 did not contemplate such procedure, and on the further ground that the reports contained rumor, gossip and hearsay and other incompetent and irrelevant matters. Thereupon the trial court stated that counsel for the govern-

ment would be permitted to read only the individual daily reports extracts of which had been used by appellant's counsel in his cross-examination of Smith. Following the ruling of the court, government counsel read into the record only those daily reports of the witness extracts of which had been used or referred to by appellant's counsel in his cross-examination of the witness.

Appellant contends that the ruling of the court constituted prejudicial error. Appellant also contends that the error of the court was compounded by the court's failure to instruct the jury that the complete reports were to be considered by it not as evidence in support of the charges against appellant but for such bearing as they might have on the weight to be given to the testimony of patrolman Smith. Admittedly, appellant made no such request of the court at any time before or after the reports were read, nor did appellant's counsel request that such instruction be read as a part of the court's instructions to the jury.

█ █ We are unable to see how appellant can claim prejudicial error based upon the daily reports which were read by government counsel prior to any objection on the part of appellant. Appellant's counsel sat silent while reports covering ten pages of transcript were read to the jury. We concede that in large portion the reports were incompetent, irrelevant and immaterial, and no doubt would have been excluded if appellant's counsel had objected, or would have been stricken from the record on motion of the appellant. We assume that appellant's counsel did neither under his belief at that time that the subject matter of the reports would be more helpful than harmful to appellant's case. Furthermore, some portions of such reports were properly received under the doctrine of testimonial completeness which permits the introduction into evidence of an entire statement when only a portion of it has been used by an opponent. This affords the trier of fact a complete understanding of the total tenor and effect of the statement in its proper context. See

7 Wigmore on Evidence, § 2113. In the instant case the extracts of the reports used by appellant's counsel on cross-examination of Smith were used in the main to impair and undermine the credibility of Smith in the eyes of the jury. Under such circumstances it was within the sound discretion of the trial court to permit relevant portions of the remainder of the reports to go to the jury for the limited purpose of reestablishing the witness' credibility. Affronti v. United States, 8 Cir., 1944, 145 F.2d 3, 8; Jones v. United States, 9 Cir., 1908, 162 F. 417, 432. Appellant's counsel had ample opportunity to examine these reports prior to their being read into the record and should have called the attention of the court to any portions which he considered to be irrelevant to the limited use for which they were being read.

█ In respect to reports read into the record by government counsel after appellant's objection, we have already noted that the trial court permitted government counsel to read only those reports extracts of which had been used by appellant's counsel in his cross-examination of Smith. While it would have been better practice for the trial court to have limited the reading of such reports on the basis of relevancy rather than the arbitrary method of allowing the complete daily report so long as the appellant used some part of the report for the day involved, counsel for appellant has failed to point out any irrelevant portion read to the jury which constitutes prejudicial error. This is particularly true in view of the irrelevant and incompetent portions of the reports which appellant's counsel permitted government counsel to read into the record without objection. Furthermore, it was made clear to the jury by appellant's counsel that the portions of the reports which were read by government counsel concerning the unlawful activities of Bolton and other persons did not constitute substantive evidence against the appellant. This is made clear by the recross-examination of the witness by appellant's counsel, where-

in the following questions and answers appear:

"Q. [Appellant's counsel] Now, the material in these reports relating to Bolton and these other people that you have mentioned had nothing whatever to do with Ed Short, the defendant in this case; is that correct? A. [Witness Smith] How is that, sir?

"Q. The portions of these reports which have been read by Mr. Connor [United States Attorney] relating to Eddie Bolton and Fay Hodge and other people named had nothing whatever to do with the defendant in this trial, Ed Short; is that correct? A. Portions of them had nothing to do with Mr. Short; no, sir.

"Q. The only thing that had any connection between Mr. Short and Mr. Bolton, to your knowledge, was that Ed Bolton borrowed some money from Ed Short; isn't that correct? A. That is what he stated; yes, sir."

While we recognize that the doctrine of testimonial completeness must be carefully applied by the trial court, we are unable to agree with appellant's counsel that in the circumstances of this case appellant suffered any prejudice by the rulings of the trial court on this subject.

Appellant also complains that the trial court erred in refusing to permit cross-examination of the police chief, T. H. Miller, concerning charges by Bolton that the police chief was the instigator of the idea of opening the town up, and in refusing to permit one Harold E. Smith, produced by the defense, to testify as to conversations with the patrolman, Walter O. Smith. However, in his argument appellant has failed to show how the denial of this right of cross-examination and the use of a further witness in any way prejudiced the appellant's rights.

Appellant's final contention is that the court erred in instructing the jury as follows: "All evidence relating to any admission or incriminatory statement claimed to have been made by a defendant outside of court should be considered with caution. and weighed with great care." Appellant claims that there was no evidence to indicate that the defendant had made any such admission or incriminatory statement and that the effect of giving such an instruction could only be harmful to the rights of the accused. With this we cannot agree. The record reveals that two witnesses, Bolton and patrolman Smith, both testified to what could be interpreted as admissions or incriminatory statements of the appellant.[1] Under the circumstances, it is

---

1. These statements appear in Edward Clifford Bolton's testimony:

"Q. And what did he say? A. He just nodded and said that he may be interested in opening up a 'two and four'.

"Q. A 'two and four?' A. Yes.

"Q. And then what else happened on that occasion? A. He just told me to send the man around. * * *

"Q. Then Mr. Short replied, and isn't this correct, 'Well, if you want to send them over, or send him over, or send them over, I will talk with them. I might be interested in a "two and four" game,' or words to that effect? A. Words to that effect; yes."

Walter O. Smith's testimony includes these statements:

"Q. Well, then you say you were getting up to leave, and what happened then? A. Mr. Short made the remark, he said, 'Don't run off. I would like to talk to you,' or, 'I want to talk to you for a minute,' so I sat back down, and he said, 'I would like to open up a "two and four" game in the back.'

"Q. What did you say? A. And so I told him that might be possible, and he made the remark, 'I had heard the town was going to be opened up,' and he wanted to know what it would cost * * *

"Q. So, when you went back to the bar with this note, tell us what happened then? A. I went back and, as I say, I explained to Mr. Short the conversation that I had had with the Chief, and he said, 'Well, I want to talk it over with my partner a minute,' so he went out the front of the bar and he was gone approximately four or five minutes, and he came back and he said, 'It is O.K. with my partner' * * *

A. * * * when I was in the washroom Mr. Short came in and he handed

clear that this instruction which, if any-thing, is favorable to the appellant is clearly called for by the evidence in the record.

Finding no prejudicial errors, the judgment of the trial court is affirmed.

*we* five twenty dollar bills, and he said this one hundred dollars was to apply on

the first week after District Court closes."